**UNITED STATES of America, Plaintiff**

v.

**Wayne A. DICK, Defendant**

**No. CR.A. 02–10307–GAO.**

United States District Court,
D. Massachusetts.

Feb. 13, 2003.

Diane C. Frenier, Ass't U.S. Atty., United States Attorney's Office, Boston, MA, for United States, Plaintiff.

Arthur M. Khoury, Esq., Lawrence, MA, for Wayne A. Dick, Defendant.

*SENTENCING MEMORANDUM*

O'TOOLE, District Judge.

On July 29, 2002, the defendant, Wayne Dick, pled guilty to five counts of receipt of stolen moneys, 18 U.S.C. § 2315, and two counts of filing a materially false federal income tax return, 26 U.S.C. § 7206(1). A sentencing hearing was held on January 13, 14, and 15, 2003. At the hearing, I heard argument on five issues pertaining to the proper calculation of Dick's sentence under the November 1998 version of the United States Sentencing Commission Guidelines Manual: (1) whether the amount of financial loss that ought to be attributed to Dick under § 2B1.1(b)(1) exceeded $800,000; (2) whether the defendant should receive an adjustment for his role in the offense as a manager or supervisor under § 3B1.1; (3) whether the two tax counts should be grouped with the five theft counts under § 3D1.2(c); (4) whether Dick's offense level should be adjusted downward for acceptance of responsibility under § 3E1.1; and (5) whether the Court should depart from the otherwise applicable Sentencing Guideline range for extraordinary acceptance of responsibility under § 5K2.0.

At the end of the hearing, I stated the reasons for the resolution of all these issues on the record in open court. Most of the issues were resolved on the facts pecu-

liar to this case, but resolution of the question whether the theft and tax counts should be grouped involved interpretation of a guideline provision as to which there is not directly applicable First Circuit precedent and there has been disagreement among other circuit courts. In this memorandum I explain my resolution of that controversy in the context of the facts of this case.

### Summary of Facts

A brief summary of the pertinent facts suffices for purposes of this memorandum. Starting in 1998, Wayne Dick participated with several other persons in an elaborate scheme to defraud Demoulas Supermarkets out of a considerable sum of money. Dick was a food buyer for Demoulas and interacted with brokers and salesmen representing various food manufacturers and vendors. Such vendors often purchased promotional advertisements in Demoulas advertising circulars. It was the practice of Demoulas to invoice the vendor for such advertisements, and the vendor would pay the invoice by check. Typically, the transaction was handled for the vendor by the food broker and for Demoulas by a buyer, such as Dick.

The criminal scheme involved diverting payment checks from vendors intended for Demoulas, causing them to be cashed or converted into other checks by complicit bank tellers, and dividing the proceeds among the various participants. Dick held a trusted position within Demoulas that permitted him to arrange for the promotional advertisements requested by vendors without generating a Demoulas invoice for the service, as should have been done. As a result, Demoulas's records would not indicate any payment due from the vendor. Instead, counterfeit invoices were prepared and sent to the vendor for payment. From the vendor's point of view, everything appeared regular; it was paying for advertising it had actually received. From the point of view of Demoulas's internal accounting, the diverted checks were not missed because they were not expected, there being no record of an invoice. In the course of the scheme approximately $1.8 million was diverted, cashed, and divided among the several participants, including Dick. Not surprisingly, Dick did not report the income generated by the scheme on his federal income tax returns.

In 2000, the scheme came to an end after a bank official noticed a very large Demoulas check being processed through the personal bank account of Daniel Martin, one of the other people involved in the illegal check cashing. A short time later, after discussions with Demoulas representatives, Dick, Martin, and yet another participant, Robert Stella, repaid a significant portion of the stolen money.

### Grouping the Receipt of Stolen Monies Counts with the Filing of False Tax Returns Counts

█ When a defendant is convicted on multiple counts, the Sentencing Guidelines generally require that the offense level be separately determined for each count. United States Sentencing Commission, Guidelines Manual ("USSG"), § 1B1.1(d) (Nov.1998). A combined offense level is then determined in accordance with the rules set forth in § 3D1.4. However, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group" before determining the combined offense level. § 3D1.2. The goal of the grouping rules is to limit "the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct" when a defendant is charged with "closely intertwined" offenses. USSG Ch.3, pt. D, intro. comment. "In essence, counts that are grouped together are treated as consti-

tuting a single offense for purposes of the guidelines."

The Guidelines set forth four circumstances when multiple counts should be considered to involve "substantially the same harm," so that grouping will be required. § 3D1.2(a)-(d). Dick argues that his offenses fall in the category outlined in § 3D1.2(c), which requires grouping when "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." He contends that this rule applies because the conduct punished under the theft counts also as a specific offense characteristic of, or an adjustment to, the guideline governing the tax counts. That guideline calls for a two-level enhancement for tax evasion "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." § 2T1.1(b)(1). Since the theft conduct was "criminal activity" that generated the unreported income, warranting an upward adjustment of two levels under § 2T1.1(b)(1), Dick argues that § 3D1.2(c) requires that the theft and tax counts be grouped to determine the applicable offense level.

The circuit courts are divided as to whether tax evasion counts ought to be grouped with counts punishing the criminal conduct that generated the unreported income. The Second and Fifth Circuits have held that grouping may be appropriate in such situations. *See United States v. Petrillo,* 237 F.3d 119, 124–25 (2d Cir. 2000); *United States v. Haltom,* 113 F.3d 43, 46–47 (5th Cir.1997). In a case in which the plaintiff was convicted of mail fraud and tax evasion, the Second Circuit held that the crimes should be grouped because "the offenses here were both frauds, were part of a single continuous course of criminal activity and involved the

same funds. It is true that the tax and fraud offenses involved different victims, an argument against grouping. However, this alone is not dispositive." *Petrillo,* 237 F.3d at 125. Similarly, the Fifth Circuit found that mail fraud and tax evasion counts should be grouped because without grouping the defendant would fall victim to "double counting of offense behavior" which the Sentencing Guidelines seek to avoid. *Haltom,* 113 F.3d at 46–47 (citations and quotations omitted). The Fifth Circuit conceded that by grouping the tax and mail fraud, the "anomalous" result was that the plaintiff would be spared "any incremental punishment for his tax crimes." *Id.* at 47.

The Third, Sixth, Seventh, Tenth, and District of Columbia Circuits have disagreed with the Second and Fifth Circuits and have held that tax evasion counts should not be grouped with counts charging the criminal activities that gave rise to the unreported income. *See United States v. Peterson,* 312 F.3d 1300, 1304 (10th Cir. 2002); *United States v. Braxtonbrown–Smith,* 278 F.3d 1348, 1356 (D.C.Cir.2002); *Weinberger v. United States,* 268 F.3d 346, 354–55 (6th Cir.2001); *United States v. Lindsay,* 184 F.3d 1138, 1142–43 (10th Cir. 1999); *United States v. Vitale,* 159 F.3d 810, 813–14 (3d Cir.1998); *United States v. Johnson,* 117 F.3d 1010, 1014 (7th Cir. 1997). These circuits have pointed out that the harms of tax evasion and the underlying criminal conduct do not involve "substantially the same harm" since their effects are felt by different victims. *See e.g., Johnson,* 117 F.3d at 1014; *see also Braxtonbrown–Smith,* 278 F.3d at 1356; *Lindsay,* 184 F.3d at 1142. The Third Circuit in *Vitale* also reasoned that "because the Sentencing Commission listed the failure to report criminally-derived income as a Specific Offense Characteristic for tax evasion in order to deter concealment of such income, it would negate that

deterrence were that designation the basis for grouping." 159 F.3d at 813. *See also Weinberger*, 268 F.3d at 355 ("By grouping these charges, we would allow [the defendant] to evade punishment for his tax evasion conviction. This we cannot do.").

■ The First Circuit has not decided the precise question presented in this case, but it has resolved a similar issue in a way that strongly suggests that it follow the majority of circuits on this issue. *See United States v. Lombardi*, 5 F.3d 568 (1st Cir.1993). In *Lombardi*, the district court had declined to group mail fraud counts with money laundering counts where the money the defendant had laundered stemmed from the mail fraud. *Id.* at 569. The defendant argued that the counts should have been grouped because "knowledge that the money laundered funds were derived from mail fraud was a specific offense characteristic in the guideline applicable to the money laundering counts." *Id.* at 571. The court of appeals upheld the district court's decision not to group the counts:

> The "conduct" embodied in the mail fraud counts is the various acts constituting the frauds, coupled with the requisite intent to deceive; the "specific offense characteristic," in U.S.S.G. § 2S1.2(b)(1)(B), is knowledge that the funds being laundered are the proceeds of a mail fraud. It happens that Lombardi's knowledge of the funds' source derives from the fact that he committed the frauds, but that does not make the fraudulent acts the same thing as knowledge of them.
>
> Lombardi's reading would also create a disturbing anomaly in the guideline's application. One who commits a fraud *and* launders the money (thereby knowing of its source) is normally more culpable than one who merely launders the money knowing of its sources. Yet if Lom-

bardi's interpretation were adopted, a defendant would get exactly the same total offense level whether the defendant committed the mail fraud or merely knew that someone else had committed it . . . .

*Id.* Lombardi thus gave a straightforward and common sense meaning to the guideline language, concluding that there are different harms produced by the primary or underlying crime, on the one hand, and the subsequent concealment of that crime by activities such as laundering or nonreporting, on the other. Applying the *Lombardi* approach to the present case, the receipt of stolen moneys and the failure to report income as required by the tax code do not, simply put, involve "substantially the same harm," even though the crimes may be related in a significant way. The conduct involved in the theft counts—receiving the stolen moneys in the first place—is not the same as the specific offense characteristic in the tax evasion guideline—failure to report proceeds of criminal activity—and the counts should not be grouped.

The same result is reached if one considers the purpose of the grouping rules generally and the sense behind § 3D1.2(c) in particular. As noted above, the grouping rules generally aim to avoid the double counting of sentencing factors that might result from calculating a guideline range separately for every count of conviction. In particular, § 3D1.2(c) addresses the case where the same conduct forms the basis for, first, the offense level computation for one count of conviction and, second, a specific offense characteristic in, or other adjustment to, the offense level computation for another count. In such case, it is possible that the conduct will be counted twice. The guideline prevents the double-counting by melding the counts into

a single group so the conduct will count once, but only once.

There are also situations, and this is one, where grouping the counts would not only forestall double counting, but would avoid giving any weight at all to an aggravating factor that under the applicable guideline was intended to increase the level of punishment. By giving effect only to the highest offense level among all the counts in the group, the grouping rules treat as irrelevant not only the total offense levels of the subdominant counts, but necessarily also the component adjustments to those offense levels. In this case, for example, if the theft and tax counts were grouped, the offense level computation for the theft counts would control, and the adjustment for failure to report income from criminal activity would have no effect at all on the sentence, just as if it were not provided for in the tax evasion guideline. On the other hand, if the counts are not grouped and their offense levels determined separately, then the adjustment to the offense level computation under the tax evasion guideline would have an effect on the final guideline range by raising the combined offense level by one.

For the five theft counts, the base offense level is 4, which then is increased by thirteen levels because the loss attributable to Dick exceeds $800,000. § 2B1.1(b)(1)(N). The level is adjusted upward by two levels because the offense involved more than minimal planning, § 2B1.1(b)(4)(A), and another two levels because Dick abused a position of trust, § 3B1.3, bringing the offense level for the theft counts to 21. For the tax counts, the base offense level is 14, §§ 2T1.1(a)(1), 2T4.1, increased by two levels because Dick failed to report income from criminal activity, § 2T1.1(b)(1), for a total of 16. If the theft counts and the tax counts were grouped, the higher score (attributable to the theft counts) would control, § 3D1.3(a), and the total offense level for all of Dick's criminal acts would be 21. The guideline score attributable to the tax counts, including the two-level enhancement required by § 2T1.1(b)(1), would have no effect or significance, as if the tax crimes had not occurred. See § 3D1.3(a).

However, if the theft and tax counts are treated as two separate groups, the offense level for the tax counts, including the § 2T1.1(b)(1) enhancement, would have an effect on the final offense level, and consequently on the punishment actually imposed. Under the modulated rules for determining the combined offense level for multiple groups, the starting point would be the highest among the separately scored offense levels, in this case, 21 (the offense level applicable to the theft group). There would then be a one-level upward adjustment because the offense level tax group is within five levels of that of the theft group, § 3D1.4, yielding a total offense level of 22. This interpretation reflects the reality that Dick pled guilty to tax evasion as well as theft and punishes him for both. It permits effect to be given to the tax evasion guideline, including the adjustment, avoiding the "anomaly" commented on by some courts. See, e.g., Lombardi, 5 F.3d at 571; Haltom, 113 F.3d at 47. It is thus fully consistent both with the tax evasion guideline and with the grouping rules' prophylaxis against double-counting or multiple punishment.

**Conclusion**

In determining the guideline range, for the reasons stated above as well as those stated in open court during the sentencing hearing, I concluded that the proper computation of the offense level was 22, and reduced that three levels to 19 in recognition of Dick's acceptance of responsibility. See § 3E1.1(b). The guideline range for an offense level of 19 and a

criminal history category of I is 30–37 months. I sentenced Wayne Dick to a term of imprisonment of thirty months followed by supervised release for a term of two years. Dick was ordered to pay a monetary fine of $6,000, as well as the mandatory assessment of $700 ($100 for each of the seven counts of his conviction).